SID WOLINSKY (CA Bar No. 33716)
JULIA PINOVER (CA Bar No. 255088)
DISABILITY RIGHTS ADVOCATES
2001 Center Street, Fourth Floor
Berkeley, California  94704-1204
Telephone:      (510) 665-8644
Facsimile:      (510) 665-8511
TTY:            (510) 665-8716
Email:          general@dralegal.org

DANIEL MASON (CA Bar No. 54065)
JOSE UMBERT (CA Bar No. 227318)
ZELLE HOFMANN VOELBEL MASON & GETTE LLP
44 Montgomery Street, Suite 3400
San Francisco, California 94014
Telephone:      (415) 693-0700
Facsimile:      (415) 693-0770

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTERN REGIONAL ADVOCACY PROJECT, a nonprofit organization, and CALVIN DAVIS, on behalf of himself and all other individuals similarly situated, and ANTHONEY COLEMAN, on behalf of himself and all other individuals similarly situated. | Case No.: CV 08 4087<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Judge: Hon. Maxine M. Chesney<br><br>Date:<br>Time: |
| Plaintiffs, | |
| v. | |
| MAYOR GAVIN NEWSOM, in his official capacity, BOARD OF SUPERVISORS OF SAN FRANCISCO COUNTY, in their official capacity, | |
| Defendants. | |

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1

2

3

I.      Introduction .................................................................................................... 2

II.     Factual Allegations of the Complaint ........................................................... 4

III.    Standard of Law .............................................................................................. 7

IV.     Argument ......................................................................................................... 7

        A.      Plaintiffs State A Claim Under Section 504 of the Rehabilitation Act of 1973. .... 7

                i.      *Defendants receive federal funds.* ................................................... 8

                ii.     *Plaintiffs qualify for benefits of the emergency shelter bed program.* ......... 8

                iii.    *Defendants discriminate against people with disabilities in their administration of the emergency shelter bed program.* ............................... 9

        B.      Plaintiffs Properly State A Claim Under Title II of the Americans with Disabilities Act .................................................................................................. 15

                i.      *No Discriminatory Intent Is Required Under Title II.* ............................ 16

                ii.     *Equal Requirements Are Not Necessarily "Equal."* ............................... 17

                iii.    *Income Eligibility Requirements Not "Neutral".* ................................. 18

                iv.     *Failure to Provide Reasonable Accommodations* .................................... 21

        C.      Plaintiffs Have Properly Stated A Claim Under Title III of the Americans with Disabilities Act .................................................................................... 22

        D.      Plaintiffs Have Properly Stated A Claim Under California Civil Code §54 and California Government Code §11135. ............................................ 23

        E.      Plaintiffs Have Properly Stated A Claim Under Welfare and Institutions Code §17000 ............................................................................................... 24

IV.     Conclusion ..................................................................................................... 25

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

## Cases

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007) .......................................... 7
*Bragdon v. Abbott*, 524 U.S. 624 (1998) .......................................................................................... 10
*City and County of San Francisco v. Superior Court* (1976) 57 Cal.App.3d 44, 47, 128 Cal.Rptr. 712................................................................................................................................................. 25
*Cooke v. Superior Court,* 213 Cal.App.3d 401, 413-14, 261 Cal.Rptr. 706 (1989) .................... 25
*Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996)............................................................ 16, 17, 18
*Disabled Rights Action Committee v. Las Vegas Events, Inc.*, 375 F.3d 861 (9th Cir. 2004)....... 23
*Does 1-5 v. Chandler*, 83 F.3d 1155 (9th Cir. 1998) ................................................................. 11, 12
*Duvall v. County of Kitsap,* 260 F.3d 1124 (9th Cir. 2001)................................................................ 8
*Everest & Jennings, Inc. v. American Motorists Ins. Co.*, 23 F.3d 226 (9th Cir. 1994)............... 20
*Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003)........................................................................... 10
*Giebler v. M&B Associates*, 343 F.3d 1143 (9th Cir. 2003)................................................. 14, 15, 16
*Hal Roach Studios, Inc. v. Richard Feiner And Co., Inc.*, 896 F.2d 1542 (9th Cir.1990)............... 7
*Helen L. v. DiDario*, 46 F.3d 325 (3d Cir. 1995) ............................................................................ 17
*Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181 (E.D.N.Y. 2000), *aff'd, Henrietta D. v. Bloomberg*, 331 F.3d 261 (2nd Cir. 2003)................................................................................................ passim
*Johanson v. Huizenga Holdings*, Inc., 963 F. Supp. 1175 (S.D. Fla. 1997) .................................. 23
*Lentini v. Cal Ctr. for the Arts*, 370 F.3d 837 (9th Cir. 2004) ...................................................... 17
*Lovell v. Chandler*, 303 F.3d 1039 (9th Cir. 2002)....................................................... 8, 16, 18, 19
*Mooney v. Pickett* (1971) 4 Cal.3d 669, 676, 94 Cal.Rptr. 279 ...................................................... 25
*Munson v. Del Taco, Inc.* 522 F.3d 997 (9th Cir. 2008)................................................................. 17
*NL Industries, Inc. v. Kaplan*, 792 F.2d 896 (9th Cir. 1986)............................................................. 7
*O'Guinn v. Lovelock Correctional Center*, 502 F.3d 1056 (9th Cir. 2007)....................................... 8
*Patterson v. Kerr County*, No. SA-05-CA-0626-RF, 2007 WL 2086671 (W.D. Tex. 2007)....... 21
*Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004)......................................................................... 16, 18
*Sanchez v. Johnson*, 416 F.3d 1051 (9th Cir. 2005) ....................................................................... 21
*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ......................................................................................... 20
*See Clegg v. Cult Awareness Network*, 18 F.3d 752 (9th Cir. 1994)............................................. 20
*Smith v. Jackson*, 84 F.3d 1213 (9th Cir. 1996).............................................................................. 7
*United States v. Morton*, 467 U.S. 822 (1984).............................................................................. 21
*Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136 (9th Cir. 2003) ....................................... 20
*Weaver v. N.M. Human Serv. Dep't*, 123 N.M. 705, 945 P.2d 70 (1997) ............................. 11, 22
*Weinrich v Los Angeles County Metropolitan Transportation Authority*, 114 F.3d 976 (9th Cir. 1997) ........................................................................................................................................... 11
*Western Mining Council v. Watt*, 643 F.2d 618 (9th Cir. 1981)................................................... 20

## Statutes

29 U.S.C. § 794 (a) ................................................................................................. 3, 7, 8, 13
42 U.S.C. §§ 12101 et seq................................................................................................... passim
45 C.F.R. § 84.4(b)(4)......................................................................................................... 8, 10
California Civil Code §54 ..................................................................................................... 4, 7, 24
California Government Code §11135 ..................................................................................... 4, 7, 24
California Welfare and Institutions Code §17000 ......................................................... 4, 7, 9, 24

## Other Authorities

H.R. Rep. No. 101-485, pt. 2 (1990).................................................................................... 23
S.Rep. No. 101-116 (1989) ................................................................................................. 23
U.S. Code Cong. & Admin. News 1990, pt. 2 ................................................................. 23

## Rules

FRCP 12(b)(6) ............................................................................................................... 3, 7, 9

## Regulations

24 CFR 8.4(b)(1)(ii) .......................................................................................................... 8
28 C.F.R. §35.130(b)(8)................................................................................................ 17, 19, 21

1

## I.      INTRODUCTION

2
3       Defendants' Motion to Dismiss ("Motion") reflects a substantial disconnect from what is

3       actually pleaded in the Complaint.  Plaintiffs have not alleged that the County Adult Assistance

4       Program ("CAAP") or Care Not Cash ("CNC") or Proposition N are invalid.  Nowhere in the

5       Complaint do Plaintiffs claim that the eligibility criteria for CNC should be altered.  Nor do

6       Plaintiffs allege that they should be enrolled in CNC despite not meeting eligibility requirements.

7       Plaintiffs' allegations concern San Francisco's broader homeless emergency shelter bed system.

8       Although Defendants admit "San Francisco's general shelter program is distinct from CAAP and

9       [CNC] reforms to CAAP", their Motion repeatedly conflates the two (Motion p. 8).

10      What Plaintiffs actually allege is that Defendants discriminate against homeless people

11      with disabilities in the allocation of very scarce emergency shelter beds.[1]  As the Complaint

12      states, Plaintiffs are "homeless people with disabilities who have been and are being

13      discriminated against by Defendants' operation of the homeless shelter system and the Care Not

14      Cash program in a manner than denies Plaintiffs access to San Francisco's homeless shelter

15      programs and services."  (Complaint p. 3, ¶14.) Plaintiffs also allege, in a very fact-specific

16      complaint, that the manner in which Defendants have chosen to *administer* CNC *in practice*

17      directly results in discrimination against disabled men and women in access to, allocation of, and

18      retention of scarce emergency shelter beds.[2]  Shelter beds are essential services for homeless

19      people with disabilities, and Defendants have directly targeted these resources for elimination.

20

21      The City campaigned actively for Proposition N (the ballot initiative that authorized Care

22      Not Cash). Once it passed, there were many ways Defendants could have elected to implement

23      CNC. The most straightforward way would have been to provide 350 additional shelter beds for

24      those persons Defendants enrolled in CNC (and for whom they drastically cut the recipients'

25      already meager general assistance ["GA"] grants). Providing such beds would have actually

26      furthered the purpose of Proposition N, which, as Defendants admit, was to provide housing,

27

28

---
[1] See Complaint p. 5, ¶32.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

utilities, and meals; drug and alcohol treatment; mental health care; and job training for homeless people. Instead, Defendants did something quite different. They enrolled homeless people in the CNC program and slashed their subsistence GA grants from $336 a month to $59. In return for cutting the grant of these destitute people to less than $2 a day, Defendants gave them nothing new.  Rather, the City took away 320-350 existing shelter beds that had been previously available to the general homeless population (the majority of which consists of people with disabilities), thus displacing disabled homeless people and giving their beds to CNC participants—a population far less disabled.

Defendants' Motion ignores virtually all of the factual allegations of the Complaint, including the central fact that San Francisco has a dire shortage of shelter beds.  In the face of this shortage, San Francisco decided to use its CNC system to "lock up" a critical twenty-five percent of all the scarce shelter beds exclusively for CNC participants, taking away a substantial benefit from a largely disabled homeless group and reserving it for a population far less disabled.

Defendants also mischaracterize GA as a "needs-based" program. In fact, neither GA nor CNC are needs-based, but are based on specific and detailed statutory and regulatory eligibility criteria. The emergency shelter system, in contrast, is truly needs-based.[3]  Further, the City's Motion repeatedly mischaracterizes the function, purpose, and operation of these multiple programs.  In sum, the theories advanced by Defendants to justify their discrimination are conceptually flawed, mischaracterize the shelter program, and are based on multiple factual assumptions (which are not only mistaken, but have no place in a FRCP 12(b)(6) motion).

Plaintiffs' Complaint validly states federal claims under Section 504 of the Rehabilitation Act of 1973; Title II and III of the Americans with Disabilities Act (ADA); and state claims

---

[2] Id. ¶31.
[3] As alleged in the Complaint, Plaintiffs are in dire need of the emergency shelter bed program. "Most of the people sleeping on the streets are disabled and sleep on the street because they are unable to get a shelter bed." Complaint, p. 5, ¶33. Each night, about 2,800 homeless people sleep without shelter.  Id. ¶34. Especially for homeless people with disabilities, the consequences of this system can be life-threatening.  Complaint p. 9, ¶52.

*WRAP, et al. v. Mayor Newsom, et al.*, Case No. CV 08-4087
**Plaintiffs' Opposition to Defendants' Motion to Dismiss**

1   under California Civil Code §54, California Government Code §11135 and California Welfare

2   and Institutions Code §17000.

3   ## II.   FACTUAL ALLEGATIONS OF THE COMPLAINT [4]

4            San Francisco, which has one of the most dire affordable housing shortages in the

5   country (Complaint p. 9, ¶ 51), also has a severe shortage of shelter beds to house its homeless

6   people. There are now approximately three homeless adults without shelter for each of the City's

7   available emergency beds. (Complaint p. 5, ¶ 33.)  This ratio constantly worsens as the City

8   continues to close shelters and fails to replace lost beds and services.  (Complaint p. 8, ¶¶47-48.)

9

10           In this situation, Defendants have decided to use the Care Not Cash program to allocate

11   scarce shelter resources and to determine which homeless men and women should, and which

12   should not, be entitled to preferential bed reservations and priority case management services.

13   (Complaint p. 6, ¶ 36.)  Specifically, persons enrolled in CNC are given the substantial

14   advantage of making a 45-day reservation for a shelter bed. (Complaint p. 1, ¶ 3.)  In practice,

15   the City's administration of CNC thus directly results in some homeless people receiving beds

16   while other men and women are forced to sleep in alleyways and cardboard boxes. Each night,

17   about 2,800 homeless people in San Francisco sleep without any shelter. (Complaint pp. 5-6, ¶

18   34.) This number, however, is likely a gross underestimation. (Complaint p. 5, ¶ 34.)

19

20           Over half of San Francisco's homeless people are disabled, including men and women

21   with mental illness, blindness, mental retardation, and dependence on wheelchairs. (Complaint

22   p.1, ¶ 2.) The CNC system both on its face and in practice severely disadvantages and

23   discriminates against these people with disabilities because all homeless people who receive

24   disability benefits (such as Social Security Disability Insurance, Veterans Disability Benefits, or

25   other disability benefits) are categorically rendered ineligible for the preferential benefits and

26   services CNC offers. (Complaint p. 6, ¶ 37.) Accordingly, a disabled veteran who receives as

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

---

[4] All statements in this section are taken directly from the factual allegations of the Complaint.

*WRAP, et al. v. Mayor Newsom, et al.*, Case No. CV 08-4087
**Plaintiffs' Opposition to Defendants' Motion to Dismiss**

little as $330 monthly is excluded from CNC or any equal shelter-related benefit.  Despite

Defendants' representation that CAAP's eligibility criteria are "disability-neutral," it is

extremely unlikely in practice—if not impossible—for a homeless person receiving disability

benefits to qualify for CNC.  Hundreds of vulnerable disabled people each night are thereby

denied any opportunity to access the CNC-only beds or to make a 45-day shelter bed reservation.

(Complaint p. 1, ¶ 3.) As a result, most of the people sleeping on the street are disabled and sleep

on the street because they cannot successfully access a shelter bed. (Complaint p. 5, ¶ 33.)

Moreover, the plight of men and women who are both disabled and homeless is greatly

exacerbated because the City has allocated over one quarter of all of the previously available

emergency shelter beds in the City exclusively to CNC participants. The City removes these beds

from circulation in the general emergency shelter bed system and sets them aside for CNC

participants only. Because many homeless people with disabilities are not permitted to

participate in CNC, they are categorically excluded from over 320 beds every day. (Complaint p.

7, ¶ 41.) Thus, by reducing the already grossly inadequate number of available shelter beds, CNC

also makes it much harder for people with disabilities to secure one of the leftover non-CNC

beds. (Complaint p. 1, ¶ 7.) To compound their misery, non-CNC recipients who try to access

temporarily vacant CNC beds must go through a daily bureaucratic process created by

Defendants that frequently includes multiple visits to resource centers, hours of queuing up

outside for beds, and arduous late night travels across the City. (Complaint p. 7, ¶ 42.)

In addition, even when there are empty CNC beds inside the shelter, homeless people

who are not CNC enrollees are routinely turned away.  While an empty CNC bed technically

becomes available at 11 pm, obtaining a last-minute bed requires a disabled individual to stand in

line and then walk across the most dangerous parts of the city after dark in order to check on

CNC bed availability.  Because any man or woman who is eligible for disability benefits is not

able to participate in CNC (even if there is an empty CNC bed at a shelter), a homeless woman

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    with a disability may be denied shelter solely because of her disability status. (Complaint p. 7, ¶

2    40.) Moreover, the harm done to vulnerable disabled men and women and the discrimination

3    against them is heightened because San Francisco for the past several years has engaged in a

4    pattern of eliminating shelter services, shrinking shelter resources, and closing essential shelters

5    previously available to homeless people. (Complaint p. 8, ¶ 45.)  For indigent persons with

6    disabilities, the effects are disproportionately harmful and often life-threatening. (*Id*.)

7            Further discrimination occurs because the CNC system, as administered by the City,

8    provides CNC participants with preferential assistance in obtaining more permanent shelter in

9    Single Room Occupancy (SRO) housing. People with disabilities, excluded from CNC, have no

10   opportunity to access these CNC services. These disabled people receive no preferential

11   treatment to facilitate their placement in an SRO. (Complaint p. 2, ¶ 8.)  Thus, as a direct result

12   of Defendants' actions in barring homeless people with disabilities from CNC, those men and

13   women are in fact less likely then their non-disabled peers to have access to the case

14   management services necessary to transition from emergency shelter to more permanent housing.

15   (Complaint p. 8, ¶ 44.)

16           Defendants' administration of CNC, within the wider emergency shelter program, thus

17   operates like an ambulance service with only four emergency vehicles that receives hundreds of

18   911 calls daily.  Even though the dispatcher cannot keep up with the calls for this critical service,

19   the service instructs one of the emergency vehicles not to pick up anyone who receives disability

20   benefits.  No new vehicles are purchased or utilized.  Thus, even if the fourth vehicle is close to

21   an SSDI-recipient in grave distress, it will not assist him.  The failure to treat the disabled patient

22   like his nondisabled peers clearly constitutes discrimination.  Administration of CNC is no

23   different—emergency shelter beds are, in many cases, a life-and-death matter.  Yet this scarce

24   resource is being monopolized by CNC, eliminated from the emergency shelter bed program,

25   and denied to hundreds of homeless men and women receiving disability benefits.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

The shelter program's systematic exclusion of disabled men and women means that this most needy, vulnerable class of homeless people is forced to either sleep on the street or compete for access to a shelter bed in a system that severely disadvantages them. Especially for homeless and indigent people with disabilities, the consequences of this system can be life threatening. (Complaint p. 9, ¶ 52.)

## III.    STANDARD OF LAW

In order to survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must simply "provide the 'grounds' of his 'entitle[ment] to relief.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964-1965 (2007).  Generally, a district court may not consider any material beyond the pleadings.  *See Hal Roach Studios, Inc. v. Richard Feiner And Co., Inc.*, 896 F.2d 1542, 1555, n. 19 (9th Cir.1990).  In analyzing a motion to dismiss, the Court must accept as true all material allegations in the complaint, and construe them in the light most favorable to the nonmoving party.  *See NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir. 1986); *Smith v. Jackson,* 84 F.3d 1213, 1217 (9th Cir. 1996).

The Complaint, fairly construed, validly states federal claims under Section 504 of the Rehabilitation Act of 1973; Title II and III of the Americans with Disabilities Act (ADA); and state claims under California Civil Code §54, California Government Code §11135, and California Welfare and Institutions Code §17000.  Accordingly, Defendants' Motion to Dismiss must fail in its entirety.

## IV.    ARGUMENT

### A.  Plaintiffs State A Claim Under Section 504 of the Rehabilitation Act of 1973.

Section 504(a) of the Rehabilitation Act states in pertinent part:  "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, . . . be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance  . . ."  29 U.S.C. § 794(a).  Regulation 24 CFR 8.4(b)(1)(ii) further prohibits the San Francisco homeless shelter system from providing any "housing, aid, benefit, or service,

1    in a program or activity…[either] directly or through contractual, licensing or other

2    arrangements" in a way that discriminates on the basis of handicap.  Complaint p. 12 ¶67.

3         As the Complaint alleges in detail, Defendants implement CNC utilizing both criteria and

4    methods of administration that defeat or substantially impair the objectives of their emergency

5    shelter program for persons with disabilities.  Such conduct, as alleged by Plaintiffs, clearly

6    violates 29 U.S.C. § 794(a) and implementing regulation 45 C.F.R. § 84.4(b)(4), discussed *infra*.

7    The requirements of a claim under the Rehabilitation Act are well-established. *O'Guinn v.*

8    *Lovelock Correctional Center*, 502 F.3d 1056, 1060 (9th Cir. 2007) (quoting *Duvall v. County of*

9    *Kitsap,* 260 F.3d 1124, 1135 (9th Cir. 2001)); *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir.

10   2002).  Plaintiffs satisfy all of these elements and thus state a valid claim under the

11   Rehabilitation Act.

12         i.    *Defendants receive federal funds.*

13         San Francisco receives federal funds for all its social welfare programs, specifically

14   including emergency shelters.  (Complaint ¶¶62-73.)  McKinney-Vento Act, 42 U.S.C. 11301, *et*

15   *seq.*  These monies are also utilized by Defendants in administration of their emergency shelter

16   bed program.  Thus, Defendants must comply with  Section 504 of the Rehabilitation Act.

17         ii.   *Plaintiffs qualify for benefits of the emergency shelter bed program.*

18         Defendants admit that they operate an emergency shelter bed program.  Motion p. 8.  The

19   Complaint clearly alleges, "Most of the people sleeping on the streets are disabled and sleep on

20   the street because they are unable to get a shelter bed." Complaint, p. 5 ¶33. Each night, about

21   2,800 homeless people sleep without shelter.  Id. ¶34. "Especially for homeless people with

22   disabilities, the consequences of this system can be life-threatening."  Complaint p. 9 ¶52.

23         Defendants ignore the factual allegations of the Complaint, claiming that they serve the

24   "most needy" of the homeless population through CAAP, or CNC.  What they imply but do not

25   expressly contend is that the emergency shelter program is somehow "gratuitous" or voluntarily

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

undertaken.  Defendants' argument erroneously assumes 1) that they are not obligated to comply

with  Section 504 in what they admit is a separate program—the emergency shelter bed

program—which serves a predominantly disabled population; 2) that determination of prioritized

"neediness" does not present an issue of fact; and 3) that the shelter bed program is not subject to

the Welfare and Institutions Code, § 17000, which actually mandates such a program and

requires it to be fair and humane—not to mention accessible to people with disabilities.

Accordingly, as Plaintiffs allege that they are in dire need of the benefits of the

emergency bed program, and Defendants do not challenge Plaintiffs' qualification for this

program, the Rehabilitation Act applies.

iii.    *Defendants discriminate against people with disabilities in their administration of
the emergency shelter bed program.*

Defendants argue that they do not discriminate against people with disabilities because

the CNC eligibility criteria are "neutral."  This contention ignores the Complaint and makes a

number of factual assumptions inappropriate in a Rule 12(b)(6) motion.

Plaintiffs do not seek to overturn the CNC program, nor Proposition N, nor CNC.

Plaintiffs have never requested that the current eligibility criteria be abandoned.  Instead,

Plaintiffs have pleaded in their Complaint that Defendants' operation and maintenance of the San

Francisco emergency homeless shelter system discriminates against people with disabilities and

fails to provide meaningful access to its programs, services, and activities as required by Federal

and state law.  (Complaint p. 9, ¶53).

The CNC program, *as it is operated by Defendants*, is both facially and in practice

discriminatory against people with disabilities.  It discriminates on its face because it

categorically excludes people who receive disability benefits. (Complaint pp. 6-7, ¶¶37, 40.) Yet

disability benefits are rarely enough to live on, and many SSI and thousands of VA benefit

recipients are still in dire need of a shelter bed.  As shall be explained *infra*, CNC discriminates

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

against people with disabilities in practice because it denies them meaningful access to shelter beds.

            a.      Discriminatory Impact on Homeless Persons With Disabilities

As Plaintiffs allege in detail, Defendants' administration of CNC also has multiple discriminatory impacts on the wider emergency shelter bed program. (Complaint pp. 4-8, ¶¶40-44; 52.) Plaintiffs thus are denied meaningful access to the shelter system and their exclusion occurs as a direct result of their disabilities. (Complaint pp 4-7, ¶52.)

CNC establishes a system of shelter beds that are set aside and denied to those with disabilities. Disabled persons are excluded from CNC and beds are taken away from the emergency shelter bed system, but substitute shelter is not created for them. Id. ¶48. In addition, as the Complaint specifically alleges, CNC has a market impact that adversely affects people with disabilities by locking up scarce low-income shelter units. Complaint ¶¶5-8.

"A recipient [of federal funds] may not . . . utilize criteria or methods of administration . . . *that have the purpose or effect* of defeating or substantially impairing accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons . . . ." 45 C.F.R. § 84.4(b)(4) (emphasis added).[5]   But that is exactly what Defendants' administration of CNC does to the emergency shelter program—it eviscerates the main benefits of that shelter program for homeless people with disabilities. While "accommodating" CNC participants with preferential 45-day "guaranteed" bed reservations, men and women with disabilities who are CNC-ineligible are denied an accommodation at all.

            b.      Plaintiffs Are Excluded on Basis of Disability

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

---

[5] The Rehabilitation Act is implemented by regulations that "are of particular significance because [the drafting agency was] responsible for coordinating the implementation and enforcement of § 504." *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181 (E.D.N.Y. 2000), *aff'd*, *Henrietta D. v. Bloomberg*, 331 F.3d 261 (2nd Cir. 2003) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998)); *accord*, *Fraser v. Goodale*, 342 F.3d 1032, 1038 (9th Cir. 2003) ("we give weight to the federal regulations . . . under the . . . Rehabilitation Act of 1973").

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    Defendants argue that "Plaintiffs have not been excluded from CAAP, or CNC, "solely

2  by reason of disability."  Their contention and the authority supporting it are inapplicable here.

3    Defendants cite *Weinrich v Los Angeles County Metropolitan Transportation Authority*,

4  114 F.3d 976 (9th Cir. 1997), which considered the plaintiff's exclusion from a reduced bus fare

5  program for failure to show documentation of income.  Unlike the claim considered in *Weinrich*,

6  Plaintiffs' claims are not based on eligibility criteria.  Instead, Plaintiffs allege that Defendants'

7  practices discriminate against people with disabilities in the emergency shelter-bed program.

8  This is not like *Weinrich*; it is not a case where a disabled homeless man is turned away from

9  shelter because he failed to document his income;  rather, the homeless man is told there are no

10  beds, period.

11

12    For similar reasons, *Does 1-5 v. Chandler*, 83 F.3d 1155 (9th Cir. 1998) is also inapposite.

13  Defendants again focus on eligibility criteria and make an abstract argument that belies the entire

14  factual context of this case.  *Chandler* involved two separate Hawaii benefit programs—one for

15  needy families with children and the other for needy individuals with disabilities.  The *Chandler*

16  court considered factual evidence presented on a motion for preliminary injunction, and

17  ultimately determined that "[t]he key issue in this case…is one of characterization" regarding the

18  nature and operation of the multiple programs.

19

20    The *Chandler* case is clearly distinguishable.  In *Weaver v. N.M. Human Serv. Dep't*, 123

21  N.M. 705, 945 P.2d 70 (1997), for example, the court distinguished *Chandler* on its facts,

22  holding a New Mexico general assistance regulation invalid under the ADA because it limited

23  the amount of time in which individuals with disabilities could receive general assistance

24  benefits. The New Mexico court distinguished the GA program at issue from the one addressed

25  in *Chandler*, finding that "[u]nlike the Hawaii General Assistance Program, New Mexico's

26  General Assistance Program is a unified program of assistance.  If this Court were to adopt

27  [defendant's] characterization of the General Assistance Program as a compilation of three

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   distinct programs, we would fail in our duty to give effect to the intent of the Legislature." *Id.* at

2   75.

3        Plaintiffs allege—and are prepared to present ample evidence—that CNC and the

4   emergency shelter-bed program operate hand-in-hand, and utilize the very same shelter beds.

5   Indeed, CNC is implemented using the shelter bed program. The administration of CNC

6   effectively allocates scarce shelter resources and prioritizes entry into the shelter system.  As in

7   the New Mexico case, San Francisco's homeless shelter program operates as a "unified program

8   of assistance" and a "cohesive program serving a single needy population."  The "use of

9   disability as the determinative factor in limiting eligibility for General Assistance benefits is the

10  denial of the benefits of a public entity by reason of an individual's disability in violation of Title

11  II of the ADA."  *Id.* at 75-76.

12       Defendants claim that CNC also serves people with disabilities and that it cannot change

13  CNC eligibility criteria without "fundamentally altering" the underlying program.  Plaintiffs do

14  not deny this, but reiterate that their claims concern the emergency shelter bed program—a

15  critical service for homeless people with disabilities—and not CNC eligibility criteria.

16       Defendants set aside between 320 and 350 (of fewer than 1,300 emergency shelter beds)

17  for CNC participants only.  The ability of CNC participants to reserve a bed for a 45-day period

18  is a unique benefit offered under CNC.  The beds not reserved, or reserved and not used, by CNC

19  Defendants divert money, priorities, and resources to CNC services that disproportionately serve

20  the non-disabled.  Defendants also provide certain services only to CNC participants such as

21  shelter beds solely for them.  Further, Defendants close and relocate shelters in a manner that

22  reduces the number of accessible shelter beds available to men and women with disabilities.

23  Finally, Defendants operate all their programs with a principal goal of eliminating the

24  "incentive" for homeless people to "congregate" here. In these ways, San Francisco administers

1  CNC in a manner that discriminates against disabled homeless men and women. Therefore, the

2  County's implementation of CNC violates section 504.

3              c.    Plaintiffs Are Entitled to Reasonable Accommodations

4        Plaintiffs suffer disparate and negative impact in the City's emergency shelter bed

5  program, and they are denied meaningful access to the benefits of this program.  Ironically, these

6  benefits instead are given only to CNC participants, when they should be given to the general

7  population of people with disabilities within the entire homeless shelter-bed system. Defendants'

8  conduct and its effect upon homeless people with disabilities constitute discrimination under

9  both federal and state disability laws.

10       Defendants have also denied disabled homeless persons reasonable accommodations

11 required under both §504 and Title II of the ADA that would allow them to meaningfully access

12 the shelter-bed program.  Even though this action is not explicitly pleaded as a reasonable

13 accommodations case, such an analysis is fully applicable here.[6]

14       The *Henrietta D.* case, *supra,* is instructive.  In *Henrietta D.*, the city had created a

15 program for residents with HIV-related illness "to access critical subsistence benefits and

16 services offered by City and State defendants."  119 F. Supp. 2d at 185  The program ostensibly

17 offered intensive services to assist clients in obtaining public assistance. *Id.*  The district court

18 found delays experienced by the individual plaintiffs.  *Id.* at 186-203.  The decision concluded

19 that the evidence "demonstrate[d] systemic problems" in the program's efficient and timely

20 administration of benefits."  *Id.* at 203.

21       The district court emphasized that to succeed on their section 504 and ADA claims,

22 plaintiffs were not required to show that the defendants treated disabled persons differently from

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

---

[6] Defendants tacitly admit that a reasonable accommodations analysis applies. (Motion pp. 14-15.)
To the extent necessary to state a claim, Plaintiffs can amend the Complaint to allege a denial of reasonable accommodations.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

others.  Rather, defendants' actions denied the plaintiffs *meaningful access* to defendants'

programs or benefits.  119 F. Supp. 2d at 206-07.

Because the plaintiffs' disability in *Henrietta D.* often threatened their health, defendants

were required to provide public assistance benefits "in some modified fashion to these plaintiffs"

in light of the many hurdles faced even by the general population when seeking to access such

programs.  *Id* at 278-79 (it was no defense that "even healthy applicants" could not negotiate the

programs).  In addition, in upholding the district court, the Second Circuit stated:  "Where the

District Court has clearly identified disability-related challenges that make access more difficult

for the plaintiff class than for those without disabilities, and has found the accommodative

scheme to be 'broken,' we hold that the plaintiffs have demonstrated that their disabilities are a

cause of the denial of access to benefits."  *Id* at 279-80.  Furthermore, "[t]hat others cannot avail

themselves of the services does not make the minimal access provided to the plaintiff

'meaningful.'"  *Id.* at 282.

Similarly, in a decision considering reasonable accommodations in housing, the Ninth

Circuit applied interpretations of "reasonable accommodation" in Rehabilitation Act regulations

and case law.  *Giebler v. M&B Associates*, 343 F.3d 1143, 1148-49 (9th Cir. 2003); *see also id.*

at 1149 ("we have relied on ADA cases in applying the [Rehabilitation Act], because, as a

general matter, 'there is no significant different in the analysis or rights and obligations created

by the two acts'").  The crux of the holding in *Giebler* was that "reasonable accommodations can

function to adjust for special needs that flow from the inability of disabled residents to meet

otherwise applicable financial requirements."  *Id.* at 1151.  Thus, "even when a neutral policy's

adverse effect on disabled persons is attributable to financial limitations faced by disabled

persons in securing housing, [the law] may require an exception to the policy as a reasonable

accommodation."  *Id.* at 1152.  The court concluded that "[i]mposition of burdensome policies,

including financial policies, can interfere with disabled persons' right to use and enjoyment of

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   their dwellings….”  *Id.* at 1155.  In *Giebler*, a landlord was required to permit a disabled

2   person’s parent to rent an apartment on behalf of her son, whose disability had reduced his

3   income below that required to qualify as a tenant, even when doing so conflicted with the

4   landlord’s policies.

5          As in *Henrietta D.* and *Giebler*, Plaintiffs here suffer an adverse effect from a “broken”

6   accommodative scheme and are entitled to accommodations to access the emergency shelter bed

7   program.  CNC limits eligibility for that program to those with no other income source, but

8   disabled homeless persons, such as disabled veterans, are more likely than others to have income

9   from SSDI or other welfare sources that render them ineligible for CNC.  Guaranteeing

10  preferential shelter beds for a lengthy period only to CNC participants constitutes a reasonable

11  accommodation that allows those eligible for CNC to have meaningful access to shelter beds.

12  By denying similar arrangements for those who do not meet the income requirements for CNC,

13  but who nevertheless need an accommodation to obtain shelter beds, San Francisco discriminates

14  against the disabled and fails to provide them with reasonable accommodations required by law.

15          **B.   Plaintiffs Properly State A Claim Under Title II of the Americans with Disabilities Act**

16          San Francisco administers CNC in a way that makes it more difficult for homeless people

17  with disabilities to access emergency shelter beds.  The factual context is the major scarcity of

18  beds—which Defendants utterly ignore in their Motion.  Defendants do, however, admit that in

19  order to “guarantee” a shelter bed to CNC participants, they are forced to institute a 45-day

20  reservation policy.[7]  Defendants’ policy in fact acknowledges the severe shortage of emergency

21  shelter beds (and other forms of low-income housing) in San Francisco.  Defendants have not

22  been using the “cash” which they take away from GA participants by reducing their subsistence

23  payments from $320 to $59 per month to actually provide “in-kind” housing.  In fact, the City

---

[7]A like reservation policy was *formerly* offered to the general population using the emergency shelter bed program, but is no longer available—not even to people with disabilities.

1   has failed to create any new emergency shelter beds to replace the 320 beds it has taken away

2   from the wider shelter program.   This is the essential factual backdrop against which Defendants

3   administer a discriminatory scheme within San Francisco's emergency shelter program.

4        Because the ADA incorporates many of the Rehabilitation Act standards, claims asserting

5   ADA violations often are considered together with claims asserting Rehabilitation Act violations.

6   The Ninth Circuit recognizes that "as a general matter, 'there is no significant different in the

7   analysis of rights and obligations created by the two acts." *Giebler*, 343 F.3d at 1149 (quotation

8   omitted). Indeed, the decisions in *Henrietta D.* analyzed such claims in an identical manner.

9   *Henrietta D.*, 331 F.3d at 272 (unless one of the subtle distinctions is pertinent, "we treat claims

10  under the two statutes identically").  Thus, the decisions discussed in the preceding section also

11  apply to the ADA.

12        Title II of the ADA prohibits discrimination in public services and programs.  42 U.S.C.

13  §§ 12131-12165.[8]  *See also*,  *Rodde v. Bonta*, 357 F.3d 988, 995 (9th Cir. 2004) (citation

14  omitted); *Lovell v. Chandler*, 303 F.3d at 1052.  Title II requires that any benefits provided to

15  non-disabled persons must be equally made available for disabled persons.  *Id.* at 997.

16  Governmental action that disproportionately burdens disabled people because of their unique

17  needs also is actionable under the ADA.  *Id.* at 998 (citing *Crowder v. Kitagawa*, 81 F.3d 1480

18  (9th Cir. 1996)).  If services designed for the general population do not adequately serve the

19  unique needs of the disabled, provision of such services violates the ADA.  *Rodde*, 357 F.3d at

20  998.

21        i.      *No Discriminatory Intent Is Required Under Title II.*

22        As Plaintiffs have alleged (Complaint at p. 14, ¶¶74-84), the City is discriminating

23  against homeless persons with disabilities by using "criteria or methods of administration that

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

---

[8] "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

1   have the *purpose* or *effect* of substantially impairing the accomplishment of the objectives of the

2   public entity's program with respect to persons with disabilities in violation of 28 C.F.R.

3   §35.130(b)(8)."  The assertion by Defendants that their "criteria are neutral" is simply another

4   way of saying they do not intend to discriminate.  However, it is undisputed that intent to

5   discriminate is not required under either the ADA or the California statutes addressed below.

6   *Munson v. Del Taco, Inc.* 522 F.3d 997, 1001 (9th Cir. 2008), citing, *inter alia*, 42 U.S.C.

7   §12182(b)(2)(A);  *Lentini v. Cal Ctr. for the Arts*, 370 F.3d 837, 846-47 (9th Cir. 2004)

8   ("Congress intended to protect disabled persons not just from intentional discrimination but also

9   from 'thoughtlessness,' 'indifference,' and 'benign neglect'") (citations omitted).  Moreover, it is

10  well established that a cause of action for disparate impact is available under the ADA.

11

12  *Crowder*, 81 F.3d at 1483;  *see also Helen L. v. DiDari*o, 46 F.3d 325, 334 (3d Cir. 1995).

13          ii.     *Equal Requirements Are Not Necessarily "Equal."*

14          As is the case under section 504, it is no defense to a violation of Title II that a public

15  entity's requirements for a program apply equally to all persons.  *See Crowder v. Kitagawa,* 81

16  F.3d 1480 (9th Cir. 1996).  In *Crowder*, visually impaired persons who used guide dogs sought an

17  exemption from Hawaii's imposition of a 120-day quarantine on carnivorous animals entering

18  the state, arguing that quarantine of their guide dogs violated the ADA.  *See id*. at 1481.  The

19  defendants argued there was no violation of the ADA because the quarantine was neutral and a

20  public health measure rather than a service or benefit.  *Id*. at 1483.  The Ninth Circuit rejected

21  the defendants' argument, observing that Congress intended not only to prohibit outright

22  discrimination, but also "those forms of discrimination which deny disabled persons public

23  services disproportionately due to their disability."  *Id*.  The court further held:

24

25          Although Hawaii's quarantine requirements applies equally to all persons
            entering the state with a dog, its enforcement burdens visually-impaired
26          persons in a manner different and greater than it burdens others …
            Hawaii's quarantine effectively denies these persons meaningful access to
27          state services, programs, and activities while such services, programs, and

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

---

1   activities remain open and easily accessible by others.  The quarantine,
2   therefore, discriminates against the plaintiffs by reason of their disability.

3   *Id*. at 1484.

4   In *Rodde*, 357 F.3d 988, the Ninth Circuit upheld a preliminary injunction precluding Los

5   Angeles County from closing a hospital that provided medical care disproportionately required

6   by the disabled and not readily available elsewhere in the County.  The court concluded that the

7   ADA did not altogether prohibit closure of the facility because of budget cuts, but it did so under

8   the circumstances because the county had no plan for providing medically necessary services to

9   disabled individuals elsewhere.  *Id*. at 998. Closure of the facility would therefore deny certain

10  disabled individuals meaningful access to government-provided services because of their unique

11  needs, while others would retain access to the same class of services.  *Id*.

12

13  Here, because of the unique (and life-threatening) needs of men and women with

14  disabilities who are living homeless on the streets, the re-allocation of shelter beds to the CNC

15  program is catastrophic.  Although some may receive alternative non-CNC benefits, it is rarely

16  enough to live on, much less to obtain housing in San Francisco.  Hence, 2,800 homeless men

17  and women are left on the streets each night—and at least 50% of those are disabled.  (Complaint

18  ¶35.)  Nonetheless, Defendants have taken over 320 beds from the general shelter system and

19  given them to CNC recipients; they have altogether eliminated hundreds of other shelter beds;

20  and they have denied Plaintiffs equal access to essential housing and other services that CNC

21  participants, alone, are granted.  Defendants thus are denying "meaningful access to state

22  services, programs, and activities while such services, programs, and activities remain open and

23  easily accessible by others," and the emergency shelter bed program discriminates against

24  disabled persons by reason of their disability in violation of Title II.  *See Rodde*, 357 F.3d at 996.

25  *iii.     Income Eligibility Requirements Not "Neutral".*

26  A defendant also may not necessarily avoid liability under Title II by using income as a

27  basis for exclusion from its programs. In *Lovell v. Chandler*, 303 F.3d 1039, the plaintiffs

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   challenged Hawaii's health insurance program for the indigent.  Residents were eligible for the

2   program if their income was no greater than 300 percent of the federal poverty level — a less

3   stringent income requirement than for the state's Medicaid program.  Initially, some participants

4   in the health insurance program were disabled residents who could not meet the income

5   restrictions of the Medicaid program.  Subsequently, however, the state categorically excluded

6   disabled persons from the non-Medicaid program.  *Id.* at 1045-46.

7          Defendants in *Lovell* sought to justify this exclusion on several grounds.  First, the state

8   contended that, viewed as a whole, its healthcare coverage *did* cover disabled persons – those

9   eligible for Medicaid.  The state argued that only those disabled persons unable to qualify

10   financially for the non-Medicaid program were excluded, and therefore the "disqualifying

11   criterion" was the restrictive income test of the Medicaid program.  The Ninth Circuit rejected

12   the state's argument, holding that had the plaintiffs not been disabled, they would have qualified

13   for the health program with the relaxed income requirements; therefore they were denied

14   coverage solely because of their disabilities.  303 F.3d at 1053.  Similarly, the state asserted that

15   the plaintiffs were not denied meaningful access to public benefits because the disabled still

16   could participate in the Medicaid program.  The court disagreed, holding that the State's

17   appropriate treatment of some disabled persons does not permit it to discriminate against other

18   disabled people under any definition of 'meaningful access.'"  *Id.* at 1054.[9]

19          Like the program in *Lovell*, eligibility for CNC and CAAP is governed by income

20   restrictions.  Persons with income above the eligibility level for general assistance are not

21   eligible for CNC or any of its corresponding benefits—including the crucial ability to make a

22   long-term reservation for an emergency shelter bed.  Disabled homeless persons are more likely

23   than the non-disabled to be eligible for other welfare programs that provide income rendering

24

25

26

27   _____

[9] In *Lovell*, the state claimed that it had no duty to include disabled people in its health insurance program because doing so would have "fundamentally altered" the program.  28 C.F.R. § 35.130(b)(7) (requiring reasonable modifications to avoid disability discrimination unless such modifications would fundamentally alter the nature of the program).  The Court of Appeals held that because the statute creating the program expressly excluded the disabled, the test was deemed irrelevant.  *Lovell*, 303 F.3d at 1054.

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  them ineligible for the package of benefits provided by CNC.  Given the unique needs of

2  homeless individuals with disabilities, coupled with the massive shortage of beds in the

3  emergency shelter program, Plaintiffs are thus far more likely to be living on the streets, out in

4  the harsh elements, without shelter of any kind.  (Complaint ¶¶44, 52.) Even if the "true

5  disqualifying criterion" of CNC is the income test for general assistance, that test disparately

6  impacts disabled people both by disproportionately excluding them from the particular benefits

7  of CNC, such as guaranteed shelter for a 45-day period, and by giving them access to fewer

8  shelter beds.  The County's appropriate treatment of some disabled homeless persons in CNC

9
10  does not permit it to discriminate against other disabled people.

11      The City urges the Court to find that the CNC program contains "no criterion excluding

12  people who receive disability benefits unless their incomes are above [specified] thresholds."

13  (Motion at p. 11.)   Defendant attempts to characterize the contrary assertion in the Complaint –

14  that the criteria automatically exclude disabled people – as a "legal conclusion," and argues that

15  Plaintiffs' detailed factual allegations regarding the discriminatory effects of the CNC system

16  should be disregarded.  However, the question whether the City's shelter allocation policies – by

17  design and/or in effect – discriminate against the disabled is a disputed *factual* issue which goes

18  to the heart of this lawsuit. It cannot be resolved on this motion.

19      In ruling on a motion to dismiss, the court is bound to draw all reasonable inferences in

20  favor of the plaintiff.  *Everest & Jennings, Inc. v. American Motorists Ins. Co.*, 23 F.3d 226, 228

21  (9th Cir. 1994).  "The issue is not whether a plaintiff will ultimately prevail but whether the

22  claimant is entitled to offer evidence to support the claims."  *Scheuer v. Rhodes*, 416 U.S. 232,

23  236 (1974).  It is only when the plaintiff asks the court to draw *unreasonable* inferences or relies

24  on conclusory allegations which are *unsupported by his or her factual assertions* that dismissal

25  may be appropriate.  *See Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994);

26  *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

27      The City's lone citation to *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139

28  (9th Cir. 2003) is inapposite.  In *Warren*, a composer sued several media companies for alleged

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   copyright infringement.  The court found, as a matter of law, that the compositions were "works

2   for hire" created under contract, and that plaintiff therefore lacked any protectable interest.  In

3   that context, the court held that plaintiff's proffered legal interpretation of the contract was

4   insufficient to defeat defendant's factual showing.  No such legal question may be considered

5   dispositive in the present case.

6           iv.       *Failure to Provide Reasonable Accommodations*

7           Like claims under section 504, Title II claims also can be based upon a public entity's

8   refusal to provide reasonable accommodations.  Regulations enforcing the ADA are generally

9   controlling.  *United States v. Morton*, 467 U.S. 822, 834 (1984).  "A public entity shall make

10  reasonable modifications in policies, practices, or procedures when the modifications are

11  necessary to avoid discrimination on the basis of disability, unless the public entity can

12  demonstrate that making the modifications would fundamentally alter the nature of the service,

13  program, or activity."  28 C.F.R. § 35.130(b)(7).  This regulation effectively supplies a "failure

14  to make reasonable accommodations" theory of liability for Title II claims.  *Sanchez v. Johnson*,

15  416 F.3d 1051, 1063 (9th Cir. 2005); *see Patterson v. Kerr County*, No. SA-05-CA-0626-RF,

16  2007 WL 2086671 (W.D. Tex. 2007) (issue of fact whether county jail must assign disabled

17  (epileptic) inmate to lower bunk).

18          Defendants have utterly failed to reasonably accommodate disabled homeless persons.

19  Indeed, Defendants' closure of shelters necessary for the disabled, without replacing the lost

20  beds with other accessible beds, makes it much more difficult for disabled homeless persons to

21  obtain shelter beds.  The manner in which the County operates the shelter-bed program thus

22  effectively denies shelter that the non-disabled continue to receive, and therefore denies disabled

23  individuals meaningful access to the shelter-bed system in violation of Title II of the ADA.

24  (Complaint ¶¶40-48.)

25

26

27

28

---

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    Defendants argue that changing the eligibility criteria for CNC would "fundamentally

2    alter" the CNC program.  Again, nowhere in the Complaint do Plaintiffs request that the

3    eligibility criteria for CNC should be modified.  Moreover, Plaintiffs do not claim that they

4    should be included in the Care Not Cash program despite not meeting eligibility requirements.

5    Plaintiffs do not seek to invalidate the voter-approved ballot initiative, Proposition N.

6    However, even if the purpose and function of Proposition N were somehow in conflict with the

7    relief sought here, state and local law is limited to the extent it conflicts with the ADA.  *See, e.g,.*

8    *Weaver v. N.M. Human Serv. Dep't*, 123 N.M. 705, 945 P.2d 70, 76 (1997) (holding that a New

9    Mexico administrative regulation was invalid because it limited the time in which individuals

10   with disabilities could receive general assistance benefits and violated Title II of the ADA).

11

12   Plaintiffs' fact-based allegations concern San Francisco's wider homeless emergency

13   shelter system, and how Defendants administer the homeless shelter program and CNC in a

14   manner that denies homeless people with disabilities meaningful access to San Francisco's

15   shelter programs and services. (Complaint p. 3, ¶14.)  The primary factual context for Plaintiffs'

16   claims is the emergency shelter program and its impact on people with disabilities—a severe

17   shortage of beds;  long queues at the homeless shelters;  the nature and quantities of the disability

18   benefits versus the CNC benefits;  and the inability to make a bed reservation.  (Complaint ¶42.)

19

20   **C.  Plaintiffs Have Properly Stated A Claim Under Title III of the ADA.**

21   Title III of the ADA states, "No individual shall be discriminated against on the basis of

22   disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages,

23   or accommodations of any place of public accommodation by any person who owns, leases (or

24   leases to), or operates a place of public accommodation."  42 U.S.C. §12182(a).

25   "Public accommodation" is defined in terms of twelve categories, which the legislative

26   history indicates "should be construed liberally" to afford people with disabilities "equal access"

27   to the wide variety of establishments available to the non-disabled. S.Rep. No. 101-116, p. 59

28   (1989);  H.R. Rep. No. 101-485, pt. 2, p. 100 (1990); (1990), U.S. Code Cong. & Admin. News

1   1990, pt. 2, at pp. 303, 382-383.  Among the specific categories indicated in 42 U.S.C.

2   §12181(7) is "a day care center, senior citizen center, *homeless shelter*, food bank, adoption

3   agency, or *other social service center establishment*.

4          Defendants claim that a public entity cannot be held liable under Title III, but fail to

5   recognize that in some cases a contractual relationship with a private party, in operation of a

6   public accommodation, can create Title III liability.  *See, e.g. Johanson v. Huizenga Holdings*,

7   Inc., 963 F. Supp. 1175, 1177 (S.D. Fla. 1997).  In *Johanson*, the court denied a county and

8   city's motion to dismiss Title III claims against them because, although the county and city fell

9   within Title II, they had contractual relationships with private parties subject to Title III.  Here,

10  Defendants similarly contract with private entities for the operation of some of the City's

11  homeless shelters.  It is undisputed that the operator of a public accommodation such as a shelter

12  can be liable under title III, even if the facility is partially owned or operated by a public entity.

13  *Disabled Rights Action Committee v. Las Vegas Events, Inc*., 375 F.3d 861, 875-78, 882-84 (9th

14  Cir. 2004);  42 U.S.C. §12181(7), *supra*.

15         Here, Plaintiffs have elected not to name as defendants any of the private entities who

16  contract with the City and County of San Francisco to operate individual homeless shelters

17  within the emergency shelter bed program.  If the Court finds Title II and Title III liability to be

18  mutually exclusive, then Plaintiffs request that their Title III claim be dismissed without

19  prejudice so they may reserve this cause of action.  However, Defendants' conduct is actionable

20  under Plaintiffs' ADA Title II allegations.

21         **D.  Plaintiffs Have Properly Stated A Claim Under California Civil Code §54 and**
              **California Government Code §11135.**

22

23         Defendants' have barely challenged Plaintiffs state law claims in their Motion, and have

24  simply likened these claims to Plaintiffs' ADA claims.  As explained above, Plaintiffs have

25  stated valid claims for discrimination, denial of equal benefits, and denial of reasonable

26  accommodations under the ADA Title II and the Rehabilitation Act §504.

27

28

DISABILITY RIGHTS ADVOCATES
2001 Center Street, Fourth Floor
Berkeley, California 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    Defendants admit that an ADA violation equates to a violation of California Civil Code

2 §54: "A violation of the right of an individual under the Americans with Disabilities Act of 1990

3 also constitutes a violation of this section, and nothing in this section shall be construed to limit

4 the access of any person in violation of that act." (Motion at p.19, citing §54.1(d).) Indeed,

5 Plaintiffs submit that the protections of the Civil Code are actually broader than those of the

6 ADA. The ADA sets the floor, not the ceiling, of California disability law. Thus, a violation of

7 the ADA is a per se violation of §54, but the statutes are not equivalent. Defendants further

8 agree that Government Code §11135 imports ADA standards to determine what constitutes

9 disability discrimination and concede that a violation of the ADA would signal a violation of

10 §11135. (Motion p. 19.) Accordingly, based on sections C and D (*supra*) and Plaintiffs'

11 properly-pleaded claims for discrimination under the federal disability laws, Plaintiffs have also

12 established the California state causes of action. (Complaint ¶¶93-115.)

13 

14    **E.   Plaintiffs Have Properly Stated A Claim Under Welfare and Institutions Code**
      **§17000.**

15    Plaintiffs plead a valid Welfare and Institutions Code § 17000 claim on behalf of

16 homeless people with disabilities: "Defendants are violating the aforesaid laws by adopting and

17 using policies, practices, standards, and procedures that are inhumane and unfair, and wrongfully

18 deny homeless people with disabilities access to Defendants' homeless shelter system."

19 (Complaint p. 21.) Although Defendants have not disputed Plaintiffs claim under §17000, it is

20 relevant to the claims addressed above. The County's obligation to provide emergency shelter is

21 not limited to general assistance recipients. Welfare and Institutions Code §17000 requires the

22 County to "relieve and support all incompetent, poor, indigent persons, and those incapacitated

23 by age, disease, or accident, lawfully resident therein, when such persons are not supported and

24 relieved…by their own means, or by state hospitals, or other state or private institutions." If a

25 disabled person receives benefits other than general assistance but lacks shelter, that person is

26 not relieved and supported by their own means and still needs shelter. Indeed, the County does

27 

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   not limit eligibility for shelter beds to persons eligible for general assistance.  It does not impose

2   any income criteria for access to shelter. Thus, persons receiving SSI or other welfare benefits

3   may obtain a shelter bed as long as they are able to secure a place in the shelter.  The shelter

4   program therefore is broader in scope than CNC, which by definition is limited to general

5   assistance recipients.  The County may not disadvantage disabled persons in accessing shelter by

6   locking up a scarce resource for just one subgroup of homeless persons eligible for CNC.

7       A County's obligation to support its indigent and disabled population is a *mandatory*

8   duty.  *See Mooney v. Pickett* (1971) 4 Cal.3d 669, 676, 94 Cal.Rptr. 279; *City and County of San*

9   *Francisco v. Superior Court* (1976) 57 Cal.App.3d 44, 47, 128 Cal.Rptr. 712.  A budget shortfall

10   does not allow a County to provide a lesser degree of care; "(a) lack of funds is no defense to a

11   county's obligation to provide statutorily required benefits."  *Cooke v. Superior Court,* 213

12   Cal.App.3d 401, 413-14, 261 Cal.Rptr. 706 (1989).  The State of California requires all counties,

13   by law, to administer general relief programs to ensure that California's most vulnerable citizens

14   can obtain the basic necessities required to sustain life, such as food and shelter.

## IV.    CONCLUSION

15       Proposition N and the CNC initiative were intended to address perceived problems with

16   the General Assistance program in San Francisco.  The emergency shelter bed program is

17   designed to provide basic humanitarian relief in a time of desperate need.  CNC was never

18   supposed to interfere with the shelter bed system nor to exacerbate the existing shortage of such

19   beds for homeless disabled men and women.  Unfortunately, Defendants have chosen to

20   implement it that way.  Defendants linked the two programs, took away benefits from the shelter

21   program, and gave them to CNC.  As a result, Defendants' implementation of CNC has

22   disparately burdened people with disabilities.

23       For all the foregoing reasons, Defendants' motion should be denied.

DATED: November 14, 2008           DISABILITY RIGHTS ADVOCATES

By:    /s/ Sid Wolinsky
              Sid Wolinsky, Attorney for Plaintiffs

HTS ADVOCATES
EET, FOURTH FLOOR
FORNIA 94704-1204
(510) 665-8644